Good morning. May it please the court, my name is Jennifer Rotman and I represent the petitioners in this case, the Nova family. I would like to reserve two minutes of my time for rebuttal. This case comes before the court following the BIA's affirmance, without opinion, of the immigration judge's decision to deny petitioners' applications for suspension of deportation. This case raises two issues for the court. First, is Mr. Nova a person of good moral character? And second, does the family have the requisite period of continuous physical presence in the United States? The immigration judge erred as to both of these issues. The immigration judge found that Mr. Nova lacks good moral character because he is an alien smuggler. Could you help me on something that I want to make sure I understand right? Sure. On the stop time rule, the way I understand it, what the IJ did was he said, the father doesn't qualify for good moral character because he's responsible for causing his daughters to be smuggled in. And the daughters don't have the seven years because the time runs from when they came back in to when the time is stopped, when the order to show cause was issued. Have I got that right? I would disagree, Your Honor. Okay, clarify it for me. It's easy to get mixed up on these. Okay. How I read the immigration judge's decision is that he says on page 167 of the excerpts, which is page 47 of the immigration judge's decision, he says, Therefore, I find that Mr. Nova does not possess good moral character. Finding that he does not possess good moral character in 1993 means according to the provisions of. Could you read a little more slowly? You're really reading fast. Okay, sorry. Page 147 of the excerpts? Page 167 of the excerpts. Where on 167? The second, the first full paragraph. Although I am erring in his favor? It should start, therefore. I've got ER 167, and the first full paragraph starts with also. Okay, I'm sorry, there was that mistake. There's an AR, and I've got ER 167. It should be. We're looking at the handwritten numbers. Yeah, it should be 166.1. 166. Yeah, there's a mistake in the count. Okay, therefore, I gotcha. Okay, sorry. So that paragraph starts, I must find that Mr. Nova does not possess good moral character. Finding that he does not possess good moral character in 1993 means according to the provisions of suspension of deportation, under stop time, he is not eligible for suspension of deportation. I don't see, well, what I was asking you was, I don't see that the stop time rule really has anything to do with him. And I think the IJ is saying that. He's saying under current time or stop time. It looks like he loses because of alien smuggling. So seven years, ten years, two years, just doesn't matter. And I want to know if I understand that right. Well, what I think that the immigration judges did is he said, okay, well, he lacks good moral character, so I'm stopping his time. So he basically, for Mr. Nova, found that he violated two of the provisions, both good moral character and physical presence. And then in the next paragraph, he goes on to say, he also says in the middle of the paragraph, that as to the girls, Hazy and Daisy, he says, I find that they do not possess seven years physical presence based on the stop time rules. And in immigration parlance, the stop time rule is the rule that's at. Yeah, but you go over to the next page, ER 167, and at the bottom of the second full paragraph, he says, So I make the finding that the girl's physical presence is interrupted. Right. But I think that in terms of what he did in the order that he did it, that he stopped their time based on the exit to Mexico. And so that at that point, he said that they could never accrue any more physical presence. That's right. He says that's an interruption of continuous physical presence in the U.S. because they were in Mexico. And that's right, isn't it? No, for a couple of different reasons. Well, they were in Mexico. Well, their physical time. Were they in Mexico? They were in Mexico. But their physical presence. And it was more than 90 days, as I recall. It was more than 90 days. The mother took them down there for about six months, and then she gave them to the father's mother. Well, she, after about two months, she abandoned them. And then at that point, as we discussed, their custody reverted back to Mr. Nova. And at that point, he was in their custody. Look, here's what's bothering me here. It looks to me like a solid I.J. decision. The father, he says, the girls wouldn't have just shown back up by themselves. He had to tell his sister, get them up here. I want them. And for the girls, they really did have an interruption in their presence, so you have to count the time from when they came back. He'd really like to give them a break because of the girls' disability. I'd like to know if they're entitled to a break because of the girls' disability, and I don't see it. So tell me why they're entitled to a break. Okay. Well, legally, the correct rule would be to ask under the 90-180-day rule if Hazy and Daisy had a break in physical presence. But under Ninth Circuit precedent, their physical presence tracks their custodial parent. And in this case, when they were abandoned, their custody reverted back into their father. So it's a legal fiction, but they were in the custody of their father. Wait a minute. He wasn't even married to the mother. But that's what the case law has found. And the restatement, that's in the reply brief. So even though the language that we're dealing with talks about physical presence, you say the Ninth Circuit equates physical presence with custody, even though they're not in the country. And what's the case that says custody equates to physical presence? In Leppe-Guitron, which is 16F3-1021, which is a Ninth Circuit case from 1994, the Ninth Circuit held that for immigration purposes, a child's domicile follows that of her parents. And domicile is composed of two elements, physical presence and intent to remain in the United States. Did that case involve somebody who was outside of the country? Yes, it did. And it was a different issue. It wasn't in the context of specifically just physical presence. It was in the context of domicile for purposes of legal permanent residence. But the thing is, even if that's true, domicile is a different thing from physical presence in the country. But even if your whole analysis is right, the mother was a custodial parent when she took the kids to Mexico. And it looks to me as though she breaks their presence in the United States. And the best your argument can do is restore their legal fiction presence in the United States as of the time the mother gives the kids to her mother-in-law. Well, the immigration judge finds that she abandons, she relinquishes her custodial role. Yeah, but not until after she's taken the kids to Mexico. Right, so they go to Mexico. Their time starts counting. It starts counting. It's in April of 1994. But by the beginning of June of 1994, she's abandoned them. She's relinquished all custodial roles. And under the law, their domicile, which incorporates their physical presence, reverts back to Mr. Nova. And so at that point, we just ask, where is Mr. Nova? Would she have seven years if you counted it from that June to when the order to show cause was issued? Yeah, they would have seven years because we're just going to ask backwards from order of show cause back seven years because that's when the time stops. But the time, and then the only issue is whether there was an interruption within that seven years. And it's okay if there's an interruption as long as the interruption doesn't count more than 90 days. And in this case, because of the way that the physical presence of the girls follows their parents, they could not have been outside of the United States for more than 90 days. Mr. Rotman, don't we really have a situation here in which the immigration judge, with all respect to him or her, was markedly unclear as to what the ground for finding a lack of seven years physical presence. Certainly at one point, the judge says, I find they do not possess seven years physical presence based on the stop time rules. And that, in turn, is geared through the prior sentence to what the judge called the arrangement by the father, which was the smuggling arrangement. And that, I take it, it's your argument that that would not be a tenable ground for finding an interruption of physical presence. Yes, that's our position. But there is this ambiguity as to what other things the judge had to say. So maybe we're in a situation in which we really just don't know what the judge is doing. That seems very possible. What do we do then? Well, I think that there's two possibilities. One possibility is to apply the correct legal standard and reverse the immigration judge's decision. The other possibility is to recognize that the immigration judge was confused as to what legal standard he should apply and to remand it back to the immigration judge under the Supreme Court's decision in Ventura, this court's decision in Lopez, and send it back to the immigration judge to apply the correct legal standard. Doesn't Ventura foreclose your first alternative? And the Ninth Circuit had a long history of doing things like that, applying the right standard and making the decision. And the Supreme Court told us, cut that out. Arguably, yes. I think it depends on how you construct the immigration judge's finding. You say, well, did he consider whether the girls have continuous physical presence in the United States? The answer is yes, he considered it. And he made a series of mistakes. He seemed to have applied the stop-time rules, even though they didn't apply, and maybe he also found an interruption of physical presence. But it's really absolutely not clear exactly what he did. And so in that scenario, it's possible that it could be reversed, and maybe it makes more sense to remand it back to the immigration judge to make the finding correctly in this case. Your time has expired. Thank you very much. Thank you. We'll hear from the other side. May I please the Court? My name is Jennifer Lightbody, and I represent the respondent. The record evidence in this case does not compel the conclusion that the immigration judge erred in finding that the petitioners in this case were statutorily ineligible for suspension of deportation. With respect to Mr. Nova's daughters, the immigration judge clearly found that these two individuals did not meet the seven-year physical presence requirement. The immigration judge did not make a finding with respect to the seven years physical presence of Mr. Nova. So with respect to Petitioner's statement that the issue before this Court is whether the family had accrued seven years is incorrect. The issue is whether the daughters had actually accrued seven years. And with respect to the argument that they've made here today regarding the custodial parent and whether that issue, whether the daughters can somehow accrue time that the father may have accrued, although the immigration judge didn't make that finding, isn't an issue that this Court needs to decide. And the reason for that is because the petitioners failed to exhaust that issue before the Board. Because what? The petitioners failed to exhaust that issue before the Board, and exhaustion is mandatory and jurisdictional. Speak up so we don't have trouble understanding you. I'm sorry, Your Honor. Let me see if I've got this right. On the father, time just didn't matter because he failed the good moral character prong of the test. Is that right? That's correct, Your Honor. The immigration judge did not make a finding with respect to whether the father had accrued seven years of physical presence. On the daughter, he found an interruption in their physical presence, so they didn't have the seven years? That's correct. And the issue that they've raised with respect to the custodial parent and whether they actually can go back to the father is not an issue that was ever raised before the Board, and they can't raise it for the first time here on review, which they've done in their reply brief. And, of course, the government wouldn't be able to waive that issue before the Board because it was never raised. So the fact that they're now claiming that the daughters can somehow piggyback onto the father's alleged seven years, which, of course, the immigration judge didn't make a finding with respect to that, but in any event, even assuming arguendo that he did, the daughters can't then say, okay, well, the father was really the custodial parent because the mother had abandoned them in Mexico. That issue was never raised before the Board, and it's not properly before this court on review for a failure to exhaust administrative remedies. Is it raised in their blue brief? I believe it is not raised in their blue brief. I believe that it's raised for the first time in their reply brief, Your Honor. But with respect to what the immigration judge did do in determining a lack of seven years' physical presence, it is apparent that there is at minimum an ambiguity about what the immigration judge was deciding. Is that not the case? I don't think there's an ambiguity, Your Honor. The immigration judge clearly found that the daughters did not meet the seven-year physical presence requirement. They left the country in 1994 with their mother and then returned four or five months later. If you want to tell me what it was that the immigration judge found, not what the recital is about their history. You used the word adverb clearly, and I wondered whether by clearly you meant to say that there was nothing in the immigration judge's opinion that suggested that the stop time rule was relevant. Well, the stop time rule was relevant, and when the proceedings commenced against them in, I believe it was June of 1996, that stopped the counting of the time, and they left the country in 1994. And so they couldn't have acquired that time. I'm not sure if that's answering your question. The recital by the immigration judge, I find they do not possess seven years' physical presence based on the stop time rules, and that in turn was, as I understand what the immigration judge said, that that was keyed to the fathers smuggling them in. Isn't that not the case? I don't believe it's the case, Your Honor. The stop time rule applied equally to the daughters and to the father. Counsel, I thought the stop time rule just controlled the end of the time, not the beginning. What it means is you don't accrue your seven years while you're litigating whether you get deported. Correct. Am I right? That is correct. It stops once the order to show cause is filed with the immigration court. That stops the running of the seven years. So if you've got five years then and you litigate for three, you still don't make it. Correct. That's correct. And if I misstated that, I apologize. I don't know if I was being clear. I thought that's all the IJ was talking about, that I take my end time from when the order to show cause was issued, and if the Mexican, if the mother taking them to Mexico interrupted the time, they just don't have seven years before that time. And that's how the stop time rule came into it. And it was clear, and that's what he said, and that was, I guess I don't understand what I'm not supposed to understand there. I think, Your Honor, you have it exactly correct. I mean, when the order to show cause was filed with the immigration court, that stopped the running of the time. And that was in 1996. The girls left the country in 1994. And so between 1994 and 1996, they obviously couldn't have accrued seven years. And their time had run. And so there was an interruption in service. Ms. Lightbody, I guess my difficulty is, and I apologize for this, I perhaps put my question to you in a way that wasn't easily comprehended. I, quoting the immigration judge, he says, after having found that the father is not eligible for suspension, goes on to say, I also believe that consistent with that, having their father arranged to have them brought back illegally after their mother had taken them, and this is an arrangement still that this interrupts the girls' physical presence, and I will not ascribe character to them. But for the reason of the interruption of their presence, I find they do not possess seven years' physical presence based on the stopped time rules. That's not a statement about their being physically absent from the United States for the period. It's a statement about the, quotes, arrangement, two sentences before, the arrangement being the alien smuggling. Isn't that an attribution to the daughters of the alien smuggling of the father? And that, at least with respect to that statement, I find they do not possess seven years' physical presence based on the stopped time rules. Isn't the only way to construct that sentence, to mean that there the immigration judge was keying his finding to the alien smuggling? Well, with respect to the father, but not as to the daughters. That's a sentence that's directed to the daughters' physical presence. Well, I think within that sentence there are two things. One is that he's talking about the lack of good moral character of the father, and two, the interruption in the girls' physical presence. Let me offer another construction of that sentence. As lawyers, we're used to reading but for as one mouthful. But if you put a comma in there, but for the reason of the interruption of their presence, I find that they do not possess seven years' physical presence based on the stopped time rules. It takes on a different meaning, doesn't it? But for the reason that they do not possess seven years. I think it's hard to read that as but for in the sense that the lawyers use but for. Are you referring to but for the reasons of the interruption? I'm referring to but, comma, for the reasons of the interruption of their presence, I find they do not possess seven years' physical presence based on stopped time rules. That's how I read it, too. He's saying I don't attribute the father's bad moral character to him. Correct. But for the reason that their presence was interrupted, they don't have seven years. That's just not a place where you use but for in the sense that we talk that way as lawyers. Correct. I mean, this is an oral decision which has been transcribed by someone. It's hard to count on your transcriber to catch all your comments. Exactly. And I think, really, there are essentially two findings here. One is that the father lacked good moral character, and that was the reason that he was found statutorily ineligible. The daughters, for a separate reason, didn't have continuous presence, were found statutorily ineligible for the relief. Thank you for writing, Judge Stratton. That's okay. If you want to follow this line, go right ahead. If we were reading the sentence, the but, for the reason of the interruption in isolation, and, of course, Judge Stratton may well be right that there should be a comma after but, though it's not transcribed that way. If we're reading that sentence in isolation, that might be one thing, but don't we in this light body have the obligation to construe it in relation to the immediately preceding sentence, which is, and this is an arrangement still that this interrupts the girls' physical presence, and I will not ascribe character to them, that this doesn't, that's not a this whose antecedent is they were out of the country. The antecedent of this is arrangement. The word arrangement is the word, Ms. Lightbody, I'm sure you would agree, that appears in the prior sentence, their father arranged to have them brought back illegally. So I guess my question goes back to my original question. Clearly is an adverb that perhaps is not apposite to a description of what the immigration judge was saying, right? Well, I would suggest to the court that if clearly is not a word, it appears clear to me, but I understand that the court obviously were here arguing the case, and there is a difference of opinion, but the immigration judge made two findings with respect to statutory eligibility, and, Your Honor, I see that I'm out of time if I continue to answer. Keep going until we tell you to stop. Thank you. That there were two decisions made with respect to the petitioners, the daughters and the father about their statutory ineligibility, and that one was based on a lack of good moral character and one was based on time. And while the sentences appear together, and I understand Your Honor's position, it's the government's position that those are two separate findings with respect to statutory ineligibility. May I ask about the government's position? If one could entertain the notion that there's some ambiguity about what the immigration judge was doing, if we can hold that as a possible postulate, if the government might entertain that as a possibility. Is it important to the government's policy to see that these two young women are sent away? One might think that these two, at eight years of age, being shuttled to Mexico and then back, were more sinned against than sinning than now, I guess, our late teenagers, aren't they? Many, many years have gone by. I'm wondering how much it's in the interest of the United States to override what I suggest is an ambiguous statement and send them off without even inquiring what the immigration judge thought he was doing. Well, the interest of the government is obviously, Your Honor, with all due respect to enforce the immigration laws of the country. And it is – there are statutory requirements which this immigration judge found they didn't meet. Now, with respect to the girls and the discretionary requirement of extreme hardship, the immigration judge was sympathetic and made a finding that there would be extreme hardship. And so the immigration judge was following the law and said that they are statutorily ineligible. Now, reasonable minds can differ as to the wisdom of the law, but the law is the law. And the courts are bound to follow the law, as was the immigration judge. When the law is clear. When the law is clear. And here, the immigration judge did make a finding as to the break in physical presence of these two individuals. And while the immigration judge, as I said, was sympathetic and found extreme hardship, the fact of the matter is they didn't meet the statutory requirement. And while this court may disagree with whether they should be permitted to stay or not, disagreements are not record evidence compelling a contrary conclusion, which is the standard that this court is required to apply in this case. What would happen if we were to agree with Judge Pollack's articulation of the problem here and send it back? Track for me what happens. Well, the immigration judge would then be permitted to make a finding of whether the father had seven years of continuous physical presence because that issue was not decided. On the daughters. On the daughters. There's still an issue of a discretionary decision of whether to grant them suspension of deportation. And I would assume that the immigration judge could now look at the extreme hardship issue again because it's sent back to them or back to the immigration judge. And the reason that there was extreme hardship was because these girls had to undergo surgery, I believe, at the age of 15, and that was back in 1999. This is 2004. It's five years later. Whether there's still an extreme hardship or not would be an issue that the immigration judge may be able to revisit if the case were reopened. So that would be on the table and there might be the possibility within the confines of the law for them to stay here? Or to be sent back. Or to be sent back. But I'm not sure that there's a valid reason for sent. I'm not sure I'm following. I mean, the government's position is that there was a break in service. Let me try something else then. You tell us that the reason why we can't discuss the Lepe-Guitron reasoning is because that issue was not raised before the appropriate administrative agency. Before the board, yes. How do we know that for sure? Because in the record, on appeal to the board, they didn't raise that in their brief. And where do I find that in the administrative record? To verify. Trust, but verify. Where do we verify that? Thank you. And the other side can be thinking as hard as they can about this issue too. It begins at page 24 of the administrative record. I don't have the excerpts of record in front of me. But beginning at page 24 through page 27. What they're arguing before the board is that they had seven years of physical presence and that their interruption was a brief interruption. And they do admit that the mother did abandon them, but they don't raise that as the issue before the board, that somehow there was a, that the custodian then becomes the father. They didn't raise that the custodian is then the father because the mother abandoned them. They just said that the interruption in their time here was brief and that they maintain that they should have been, that they had the seven years of physical presence. So you stylized this as a separate issue rather than just an argument that supports the generalized issue that they presented? This is a separate, the fact that they failed to exhaust it is a separate issue. Is that your question? Yeah, I mean, is it a separate issue or is it just an argument in support of an issue that they did raise regarding the? It's a separate issue because they've raised it in their reply brief. As a new basis for why the daughters had seven years of physical presence. Well, it's usually not good practice to raise things for the first time in a reply brief. Your time has expired. Thank you very much. Thank you. We'll allow you to come up and tell us why we ought to regard this as exhausted and explain why it appears only for the first time in the reply brief. Thank you. Okay. As to the issue of stop time and how it influenced the rest of the proceedings in front of the BIA and in front of the court, as Judge Pollack has pointed out, the immigration judge muddles the issues and he does use the term of art stop time rule and that's a term of art. And he uses the words interruption as well. And at the time that he was making the decision, I think the perception, even though IRA IRA existed, the perception was that the government would use the concept of the Flutie doctrine. Was this a brief, casual and innocent departure? And that's the that's exactly how it was raised to the Board of Immigration Appeals. Was this a brief, casual, innocent departure from the United States? That's how respondent briefed it to this court in their arguments before the court. And since that time, the construction has changed under the cancellation of removal rules, the current U.S. code, which is applied to which is applied to the petitioners in this case. There's a concept called treatment of certain breaks in presence. And that's where we get the 90 and 100 and 180 day rule. And so as time has evolved and it's been necessary to talk about this issue in a different way. And that's why remand would be helpful for the judge, because the legal standard has changed. Are you conceding you didn't raise this leprosy issue in front of the administrative agency, the BIA? We raised in front of the or the attorney raised in front of the BIA the issue of whether the girls had a break in continuous physical presence. Not this peculiar issue that's in the great brief. And I would say, as you suggested, that the other side says that's not exhausted. Your answer. My answer is that this is a sub argument within the overall issue. Do they have continuous physical presence in the United States? And as the argument, as the legal construction changes, the arguments need to change to reflect that. But it's always the same issue. Lepid Guitron is a 1994 case. This is not something that popped out yesterday. Why does it appear for the first time in your reply brief, this argument? Well, that is, as I said, that case actually deals with a different legal issue. So it's not related to the specifically to the treatment and breaks in presence. And we do raise in our brief the issue that the immigration judge stopped time. That's how we've been reading his decision. And so that he stopped time and possibly maybe interrupted it, too. And so we need to look at both issues. Was it stopped and was interrupted? And both of these issues were raised before the Board of Immigration Appeals. And the arguments to support it can be raised in before the Ninth Circuit and in the end in the reply brief, if necessary. Did you and your colleagues handle this matter before the BIA? We did not, Your Honor. Another local attorney handled the matter. And so just on that, I would have to say that we have not. We have exhausted the administrative remedies as to the issue of continuous physical presence and that under the new legal standard, it would be necessary to remand to the immigration judge. Help me on one more detail of this. It looks as though your argument depends on the proposition that the mother abandoned the children to the father's family in Mexico within 90 days of her arrival in Mexico. When I look at page 118 of the excerpts, it says, And why did they return to the United States? Well, the issue is that their mother needed to work. She had to work and she worked in the evenings. And she took them to my mom's house. And the girls, they cried. They cried. They didn't want to be there. They wanted to come up here to the United States. Do you have any contact with their mother? Not now. It's been several years since I've known where she was. Does she ever call your children? She has not called since 96. It looks to me as though the mother doesn't really stop contacting the children until 96. But this Mexican sojourn was in 94. And when the mother took the kids to the mother-in-law's house, I guess they weren't married, so she's not technically a mother-in-law, but the husband's mother. And when she took them there, she's not saying, I'm walking out of here. I don't want to see these kids again. I don't care what happens to them. You can take care of them, whatever. She doesn't say that. She just says they have to work at night. So it doesn't look like an abandonment. Is there something else in the excerpts that makes the abandonment clear? There is. And I have the page. I've got the excerpts right here. You just tell me where to look. Okay. I'm just looking for the page number. Okay. On page 137 of the excerpts, the immigration judge asked Mr. Nova why he had sent money to Mexico. And Mr. Nova said, I sent the money down there because they needed it. I sent the money because their mom is not with them. And so at that point, when he sends the money, which we know was in June of 19- Which is all over the lot of what the money was all about. It changes his story. I mean, you've picked out a sentence. But if you read the entire thing, he's all over the lot as to what that money is for and what was going on. Well, I'm just pointing out this to say that this shows that the mother was not with them when he sent the money in June of 1994. Okay, but that's not abandonment. I mean, gosh, in my town, so many families, one or the other parent is up on the North Slope working for months at a time. So they put the kids with another relative for a while. That's not the same thing as abandonment. Or if somebody lives in Chalkitsik, there are no jobs. They take a job in Anchorage for a while and leave the kid with the grandmother for a while. That's not necessarily abandonment. I'm looking for more evidence of abandonment within the 90 days. Well, the immigration judge found that the mother had relinquished her custodial role. Yeah, but the evidence, he doesn't say that she relinquished it within the 90 days. And as far as I can tell from the evidence, by the time the IJ is making his ruling, it seems that she has. She no longer writes or calls the kids, no contact with them for several years. But that end of contact seems to be in 96, which is two years late for your argument. Well, I think that Mr. Nova doesn't use the legalese of relinquishing the custodial role, but he says her mother is not there anymore. The mother isn't with them, and that's why he's needing to support them. And we know within the time frame that that happened within two months of the girl's entry. And I just wanted to point out another thing, which is that— Not being with them is not the same thing as abandoning them, though. She just says she has a job where she has to work nights. Well, I interpret— She puts them with grandma. A lot of people put the kid with grandma when they've got a job where they won't be home with their little kids, when the kids are home from school. Well, the immigration judge had the opportunity to use the language, not just seeing it on a piece of paper, but to hear Mr. Nova testify, to see his demeanor, to see his intent. And the judge inferred reasonably that what Mr. Nova was trying to say is that the mother wasn't with them. The mother had abandoned them. They were living with his mother in Mexico at that time. Thank you, counsel. Thank you both. The case just argued as ordered and submitted. We'll get to a decision as promptly as we can. Diaz-Guarez v. Ashcroft is submitted on the briefs. We move then, I guess, to Principal Leif v. Robinson. Thank you.
judges: Trott, Kleinfeld, Pollak